UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL L. SHERBYN, )
)
Plaintiff )
) No. 3:13-0092
v. ) Senior Judge Haynes/Bryant
)
TYSON FRESH MEATS, INC., )
)
Defendant )

## MEMORANDUM

Plaintiff Michael L. Sherbyn[1], filed this action under the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a) and the Family and Medical Leave Act,("FMLA") 29 U.S.C. § 2601, *et seq.* against the Defendant Tyson Fresh Meats, Inc. Plaintiff's former employer. Plaintiffs asserts claims for discrimination based on his disability in violations of the ADA and that the Defendant retaliated against Plaintiff for his FMLA leave requests Plaintiff also asserts claims under the Tennessee Human Rights Act ("THRA") and the Tennessee Disability Act and retaliation in violation of. ("FMLA"). The Defendant filed an answer denying liability and asserting affirmative defenses (Docket Entry No. 7)

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 37) to which Plaintiff filed his response (Docket Entry Nos. 42 and 43) to which the Defendant filed a reply (Docket Entry No. 46). In its motion, the Defendant argues, in essence, that Plaintiff's THRA claim fails as a matter of law and that for his ADA discrimination claim, Plaintiff's proof cannot show that the Defendant's stated reason for his termination is a pretext.

For the reasons stated below, the Court concludes that Defendant's motion should be granted

---

[1] It appears from Plaintiff's deposition that the correct spelling of his name is "Sherbeyn." (Docket Entry No. 42-1 at 4). Nevertheless, for the sake of consistency, the Court use the spelling in the complaint.

as to Plaintiff's THRA claims as the Tennessee Human Rights Act does not cover disability discrimination. Yet, the Defendant's motion should be denied based upon material tactual disputes about the Defendant's acts toward Plaintiff as compared to other employees. .

## A. REVIEW OF THE RECORD[2]

Plaintiff worked for Defendant Tyson or its predecessor from November 19, 1984, until his termination on February 6, 2012. Sherbyn worked at Defendant's plants in Joslin, Illinois, and Lexington, Nebraska, before his transfer to Tyson's Goodlettsville, Tenessee in January or February 2006. Sherbyn was the Raw Receiving Supervisor and his direct supervisor was Woodrow Dodds, the General Supervisor of Material Handling.

In the fall of 2008, Sherbyn requested FMLA leave for surgery on his left foot, and the Defendant granted this request. Sherbyn was on FMLA leave from August 12 until November 17, 2008. Plaintiff returned to work after in November 17th, and given his medical restrictions, the Defendant allowed Plaintiff to sit for a time when he returned to work, and later a cane once he was able to stand. In August 2009, Sherbyn requested a second FMLA leave for surgery on his right foot that Tyson granted. Sherbyn was off work from September 1 until December 1, 2009. Upon his return in December, Tyson granted Sherbyn the same accommodations for his medical restrictions as after his first surgery. On November 8, 2011, Sherbyn requested a third FMLA leave for shot treatments on his feet and a third surgery. Tyson granted Sherbyn's leave that commenced November 7, 2011 with Sherbyn returning to light duty work on January 30, 2011.

According to Sherbyn, with these leaves, he experienced a pervasive pattern of harassment

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that material factual disputes exist, and this section does not constitute a findings of fact.

Woodrow Dodds, his immediate supervisor and certain other co-employees. Plaintiff testified that Dodds began to call him "hop-along" and would occasionally suggest that Sherbyn "hop on down" to see him. Sherbyn further testified that Robert Nelson, another employee, would imitate Sherbyn by limping and then looking back to be sure that Sherbyn had seen him. Kevin Lee, another Tyson supervisor who had undergone knee surgery during one year and then a double knee replacement the following year, told. Sherbyn: "I suppose about this time of year [Lee's] going to be out again." Dodds would ask Sherbyn whether he was going to be like Lee and take three months off every year.

Sherbyn also cites Dodds directing him to respond to a problem in the plant when other supervisors were much closer and could have handled the problem more readily. In addition, Sherbyn testified that when he returned in December 2009 after his second FMLA leave, Dodds directed Sherbyn to walk to the coolers to check on them despite Sherbyn's request that another supervisor be sent because Sherbyn was then required to walk only with the assistance of a cane. Similarly, Sherbyn testified that in December 2009 Dodds denied his request for additional help in Shipping and Receiving. Sherbyn, as a Material Handling Supervisor, was expected to cover both Shipping and Receiving when another employee was out of work. This responsibility required walking between two different areas on different ends of the building. Despite the fact that Sherbyn was recovering from foot surgery and walking with the assistance of a cane, Dodds refused Sherbyn's requests for help covering both Shipping and Receiving.

In March 2011 Sherbyn was disciplined by Dodds for failing to file shrink claims. Sherbyn testified that he received a written warning, although Ronnie Wright, Sherbyn's counterpart supervisor on the B shift, also failed to complete the claim form, but was not disciplined. In July 2011, Sherbyn was placed on a performance improvement plan for failing to keep up with documentation. Sherbyn cites this performance improvement plan in July 2011 as evidence of the

Dodds's desire by to get rid of him because of problems with his feet. Prior to his foot problems documentation failures were usually dismissed with an "oh, we made a mistake, let's move on."

In August 2011 Sherbyn was disciplined again, this time for falsifying his report of a safety meeting. As a supervisor, Sherbyn was responsible for conducting periodic safety meetings with his team members. On his written report of the safety meeting of August 12, 2011, Sherbyn reported that he had covered the topics of "ascorbic acid" and "forklift mule safety." The entry for forklift mule safety was handwritten, but the remaining entries this sheet were typed. Noticing this difference, Dodds asked Sherbyn whether he had covered forklift mule safety during this safety meeting, and Sherbyn replied that he had. Dodds thereafter asked several employees who had attended this safety meeting whether the topic of forklift mule safety had been covered by Sherbyn. These employees stated that it had not been. Sherbyn later admitted that he did not give the forklift mule safety training on August 12, 2011, as reported on his meeting sign-up sheet. Sherbyn explained that he did give this training at a later time. Jay Gould, then Superintendent of Material Handling, handled this disciplinary write-up and gave Sherbyn a three-day suspension from work. Gould also informed Sherbyn that if anything like this happened again in the future that he would be terminated.

Sherbyn was disciplined again in October 2011 for not receiving a load of beef shipped to Tyson. Sherbyn testified that the plant was at that time engaged in switching over to a new system, and that the subject load was found and put back in. Although Sherbyn admits missing this load, he testified that in the past loads were missed and no one received a write-up.

During Sherbyn's absence on his third FMLA leave, a question arose regarding an unrelated employee's wage coding as a manifestor. This employee thought that he had not been given credit on his paycheck for a period when he had worked as a manifestor, who is paid at a higher hourly rate than a normal crew member. In investigating this claim, Tyson personnel obtained a printout of all employees who had been coded as manifestors and had been paid at the higher manifestor hourly

rate. This printout revealed that an employee named Driton Gashi, who reported directed to Sherbyn, had been paid at the higher manifestor rate continuously for almost two years. Gashi was questioned by Gary Denton, the Complex Human Resources Manager. Gashi stated to Denton that Sherbyn told Gashi that Gashi was Sherbyn's "go-to guy," and that as long as Gashi did what Sherbyn needed, then Sherbyn would pay Gashi at the manifestor rate. Gashi testified at deposition that Sherbyn always paid him at the manifestor rate even when Gashi was not performing manifestor duties.

On January 31, 2012, the day after his return from his third FMLA leave, Sherbyn met with Dodds and Gould about Gashi's pay. At his deposition, Sherbyn testified that before signing the periodic time and attendance sheets for his employees he "didn't look at the time codes" but "just made sure they were getting paid the correct number of hours." Sherbyn admitted that he had not checked the pay codes for Gashi and that it did appear that Gashi had been paid at the higher manifestor hourly rate instead of the lower rate of a forklift operator. At his deposition when asked about Gashi's claim that Sherbyn told him he was going to pay him as a manifestor, Sherbyn testified: "I don't remember having that conversation." Later in the deposition Sherbyn denied that he ever told Gashi that Sherbyn would give him extra pay because he was Sherbyn's "go-to guy." Sherbyn further explained that although he had failed to check the manifestor pay rate given to Gashi on the time and attendance sheets, other Tyson supervisors who supervised Gashi during Sherbyn's FMLA leave had also failed to catch and correct this error.

On February 2, 2012, Sherbyn received a written warning-suspension for misrepresenting payroll records. Four days later, on February 6, 2012, Sherbyn's employment was terminated. Sherbyn was told that he was terminated because company policy provides that any employee who received two written warnings with suspensions within any 12-month period shall be terminated.

## B. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the

party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion

7

for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

8

> It is likewise true that:
>
> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial

court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

First, Plaintiff concedes that the Tennessee Human Rights Act does not include disability discrimination. Thompson v. UGL Unicco Service Co., 750 F. Supp.2d 907, 912 (W.D. Tenn. 2010). Thus,e, Plaintiff's state claim for disability discrimination under the THRA should be dismissed, but this claim can be considered under the Tennessee Disability Act, Tenn. Code Ann. § 4-21-301, *et seq*. A TDA claim is analyzed under the same principles as those used for the ADA. Nance v. Goodyear Tire & Rubber Co., 527 F.3d 539, 553 n.5 (6th Cir. 2008). Accordingly, the Court concludes that Plaintiff's claim for disability discrimination pursuant to the Tennessee Human Rights Act should be dismissed.

For Plaintiff's ADA claim, here, where there is not direct evidence of discrimination, a claim is analyzed under the three-step framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Plaintiff must first make a prima facie showing of disability discrimination by proof that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability. Demyanovich v. Cadon Plating & Coatings, LLC, 747 F.3d 419, 433 (6th Cir. 2014). The

Plaintiff's disability must be a "but for" cause of the adverse employment action. *Id.* If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 434. If the employer does so, the burden then shifts back to the employee to prove that the employer's professed reason is a pretext for illegal discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 804.

As to the first two element, Sherbyn's proof satisfies a prima facie showing of disability discrimination given Sherbyn's multiple surgeries on his feet that required accommodations upon his return to work . Therefore, Sherbyn was an individual with a disability. In addition, the facts are that Sherbyn was qualified to perform the requirements of his position with accommodations after his multiple surgeries. Sherbyn who had been employed at Tyson for approximately 28 years, was qualified to perform the job assigned to him. Finally, Sherbyn was terminated shortly after returning from his third months-long leave for foot surgery. Thus, the Court concludes that Sherbyn has presented sufficient evidence for a prima facie showing of disability discrimination.

The next issue is, given Tyson's stated reasson for his discharge, whether Sherbyn can demonstrate pretext because Sherbyn concedes that he committed the acts for which he received the two disciplinary suspensions. First, Sherbyn admitted in deposition that he had falsely stated on the report sheet that he had covered the subject of forklift mule safety during the team safety meeting on August 12, 2011. Similarly, Sherbyn admits that Driton Gashi, one of Mr. Sherbyn's team members, was overpaid as a manifestor when not performing manifestor duties because Sherbyn signed time and attendance sheets verifying Gashi's hours and hourly wage code. Nevertheless, Sherbyn testified at deposition that other supervisors who had committed similar documentation errors did not receive disciplinary suspensions. Specifically, Sherbyn testified that the other supervisors who supervised his

team during Sherbyn's medical leave of absence in late 2011 and early 2012 also signed time and attendance sheets verifying Gashi's hourly pay code as a manifestor. Sherbyn testified that these supervisors were under the same duty as he was to report Gashi's pay code accurately. Nevertheless, Sherbyn states that only he received a disciplinary suspension while the other supervisors, who also signed incorrect time and attendance reports, did not receive any discipline. Similarly, Gashi, who knew that he was being overpaid but said nothing, was not disciplined.

Gary Denton, Tyson's local Human Resources Manager who participated in the investigation of the payroll discrepancy, testified that he accepted the statement of Gashi that Sherbyn had told Gashi earlier that he would intentionally pay Gashi at the higher manifestor hourly rate because Gashi would be Sherbyn's "go-to guy". Also, Denton testified that he held Sherbyn more accountable than other supervisors who signed time and attendance sheets during Sherbyn's absence because from a review of payroll records, it appeared to Denton that Sherbyn had first applied the manifestor pay code to Gashi.

The Supreme Court has held that summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. Anderson, 477 U.S. at 251-52. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Id. at 255. Here, although it is a close question, the Court concludes that genuine issues of material facts exist that must be decided by a jury. These issues include whether Sherbyn would have received the disciplinary suspensions that resulted in his termination had he not required to request repeated and extended absences from work for foot surgeries and to request accommodations after he returned.

As to his FMLA retaliation Claim. Sherbyn asserts that his employment was wrongfully terminated in retaliation for his taking repeated FMLA leaves. For a prima facie showing on his FMLA retaliation claim, Sherbyn must demonstrate that (1) he engaged in an activity protected by the FMLA; (2) that the exercise of his protected rights was known to the defendant; (3) that the defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Arban v. West Pub. Corp., 345 F.3d 390, 404 (6th Cir. 2003). The McDonnell Douglas burden-shifting framework applies to FMLA retaliation claims. Romans v. Michigan Dep't of Human Servs., 668 F.3d 826, 842 (6th Cir. 2012).

Tyson argues that Sherbyn's claim fails as a matter of law because (1) there is no causal connection between his FMLA leave related to his feet and the termination of his employment, and (2) Sherbyn cannot prove that Tyson's legitimate, nonretaliatory reason for its action was pretextual. Tyson asserts that Sherbyn's employment was terminated because he received two disciplinary suspensions within a 12-month period. The first suspension occurred in August 2011 and was based upon Sherbyn's listing a safety topic that was not actually covered at the weekly safety meeting that he conducted with his team. Sherbyn in his deposition admitted that the listed topic — forklift mule safety — was not covered at the meeting on August 12, 2011, as listed, but that it was covered shortly thereafter at a following meeting. Sherbyn in his testimony strongly suggests that this infraction was relatively minor and not deserving of a disciplinary suspension from work. Jay Gould, the Superintendent of Material Handling, issued this suspension to Sherbyn. Gould testified in his deposition that he relied primarily upon Woodrow Dodds, Sherbyn's immediate supervisor, for

information on Sherbyn's work performance. Dodds is identified in harassing Sherbyn based on his disability.

Sherbyn has offered testimony showing that Dodds, on multiple occasions, had made statements evidencing that he resented the extended medical leave taken by Sherbyn and by another Tyson employee, Kevin Lee. Similarly, as discussed supra, Sherbyn received a second disciplinary suspension on February 2, 2012, within days after returning to work following a third extended FMLA leave, this time for submitting false payroll records that incorrectly listed Gashi's pay code as that of a manifestor. Sherbyn points out that other supervisors who supervised his team during his medical leave during late 2011 and January 2012 also would have signed time and attendance sheets that included an incorrect payroll code for Gashi. Nevertheless, it appears that these other supervisors were not disciplined while Sherbyn received his second disciplinary suspension that formed the premise for his employment termination.

On this motion, the Court must construe the evidence in a light most favorable to Sherbyn,, and draw all reasonable inferences in his favor. In doing so, the Court concludes again that there are material factual disputes that must be decided by the jury. The Court concludes that the proof is not so one-sided as to support only one reasonable conclusion and that a jury could conclude, based upon the evidence before the Court, that Sherbyn's multiple extended medical leaves relating to his feet were a causal factor in the two disciplinary suspensions that Sherbyn received which, in turn, formed the basis for his termination. Accordingly, Tyson's motion for summary judgment regarding the claim of FMLA retaliation should be denied.

In sum, Tyson's motion for summary judgment on Plaintiff's discrimination claims under the Tennessee Human Rights Act should be granted as a matter of law, but Tyson's motion regarding the

claims for Plaintiff's claims for disability discrimination under the ADA and the TDA that adopts ADA standards as well as Plaintiff's FMLA retaliation claim should be denied.

An appropriate Order is filed herewith.

ENTERED on this 30th day of March, 2015.

William J. Haynes, Jr.
Senior United States District Judge